BLANK ROME LLP
Attorneys for Defendants
Richard V. Singleton II (RS-9489)
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0208
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPTICAL COMMUNICATIONS GROUP, INC., <br><br>                     Plaintiff, <br><br>     -against- <br><br><br> M/V AMBASSADOR, its engines, boilers, furniture, tackle, apparel, etc., *in rem* and MARBULK CANADA INC., *in personam*, <br><br>                     Defendants. | 11 Civ. 4439 (NRB) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Richard V. Singleton
Alan M. Weigel
Blank Rome LLP
405 Lexington Avenue
New York, NY  10174
(212) 885-5166
(917) 332-3734
rsingleton@blankrome.com

*Attorneys for Defendants M/V
AMBASSADOR and Marbulk Canada Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

FACTS AND PROCEDURES .......... 2

THE SUMMARY JUDGMENT STANDARD .......... 6

ARGUMENT .......... 7

POINT I .......... 7

THE VESSEL IS NOT LIABLE FOR DAMAGE RESULTING FROM DROPPING ITS ANCHOR OUTSIDEOF THE MARKED CABLE AREA .......... 7

POINT II .......... 10

PLAINTIFF BEARS THE ENTIRE RESPONSIBILITY FOR DAMAGES TO THE CABLE FOR ITS FAILURE TO COMPLY WITH THE TERMS OF ITS PERMIT .......... 10

POINT III .......... 13

DEFENDANTS ARE ENTITLED TO AN AWARD OF SANCTIONS FOR PLAINTIFF'S BRINGING AND MAINTAINING A FRIVOLOUS SUIT IN BAD FAITH .......... 13

CONCLUSION .......... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities, Inc.)*,
218 F.3d 109 (2d Cir. 2000)..................................................................14

*Algoma Cent. Corp. v. Michigan Limestone Operations*,
No. 94-1917, 1996 U.S. App. LEXIS 3454 (6th Cir. Jan. 22, 1996).........................8

*Am. Telephone & Telegraph Co. v. Steuart Transp. Co.*,
No. HM-74-698, 1978 A.M.C. 1680 (D. Md. Sep. 2, 1977) ..................................10

*American Zinc Co. v. Foster*,
313 F. Supp. 671 – 81 (S.D. Miss. 1970), *modified on other grounds*, 441 F.2d 1100
(5th Cir.), *cert. denied*, 404 U.S. 855 (1971) .......................................10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................6

*Atlantic Pipeline Co. v. Dredge Philadelphia*,
247 F. Supp. 857 (E.D. Pa. 1965), *affd.*, 366 F.2d 780 (3rd Cir. 1966) ................11

*Canadian P. R. Co. v. United States*,
272 F.2d 913 (9th Cir. 1959) ............................................................8

*Delta Transload, Inc. v. Motor Vessel, "Navios Commander"*,
818 F.2d 445 (5th Cir. La. 1987) .....................................................8, 11

*Essex County Electric Co. v. The Godafoss*,
129 F. Supp. 657 (D. Mass. 1955) ......................................................8

*Excess Ins. Co. v. Odyssey Am. Reinsurance Corp.*,
No. 05 Civ. 10884, 2007 U.S. Dist. LEXIS 88441 (S.D.N.Y. Nov. 28, 2007) .......14

*Fincher v. Depository Trust & Clearing Corp.*,
604 F.3d 712 (2d Cir. 2010)...............................................................6

*Holtz v. Rockefeller & Co.*,
258 F.3d 62 (2d Cir. 2001)................................................................6

*Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*,
642 F.3d 121 (2d Cir. 2011)..............................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................................6

134508.00601/7154349v.1

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)...........................................................................6

*Mid-America Transportation Co. v. National Marine Service, Inc.*,
    497 F.2d 776 (8th Cir. 1974), *cert. denied*, 425 U.S. 937 (1976).............................7

*Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva*,
    680 F.2d 1374 (11th Cir. 1982) ...................................................................11

*Peoples Natural Gas Co. v. Ashland Oil, Inc.*,
    604 F. Supp. 1517 (W.D.Pa.1985)...........................................................7, 8, 11

*Quarles v. Gen. Motors Corp.*,
    758 F.2d 839 (2d Cir. 1985).........................................................................6

*Scott v. Harris*,
    550 U.S. 372 (2007)..................................................................................6

*State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*,
    374 F.3d 158 (2d Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005)...........................14

*Weeks Marine, Inc. v. Am. S.S. Owners P&I Ass'n*,
    No. 10 Civ. 5191, 2012 U.S. Dist. LEXIS 46195 (S.D.N.Y. Mar. 30, 2012)..........................6

### STATUTES

28 U.S.C. §1746........................................................................................2

28 U.S.C. § 1927.......................................................................................13

Rivers and Harbors Act, 33 U.S.C. § 401, 403.......................................................10

### OTHER AUTHORITIES

Fed. R. Civ. P. 11.....................................................................................13

Fed. R. Civ. P. 56...................................................................................2, 6

iii

## PRELIMINARY STATEMENT

Defendants respectfully submit this Memorandum in support of their motion for summary judgment dismissing with prejudice Plaintiff's Complaint seeking recovery for damage to its undersea cable.  Defendants' motion should be granted.  The evidence is uncontroverted that Plaintiff's cable was laid outside the designated cable area in violation the terms of its United States Army Corps of Engineers' permit by which its construction was authorized.  The evidence likewise is uncontroverted that the cable was uncharted and unmarked.  These facts alone require summary judgment in Defendants' favor as a matter of law.

The evidence also is uncontroverted that the M/V AMBASSADOR (the "Vessel") dropped its anchor outside of the charted cable and in a navigation channel.  As the Vessel was free to drop its anchor anywhere except in areas where underwater property is marked, known or charted (such as a designated cable area), the vessel can have no liability to Plaintiff under the circumstances presented here, *i.e.*, the cable was laid outside the cable area, unmarked, and uncharted.  Accordingly, Defendants cannot be liable for the damages claimed by Plaintiff and Defendant's motion for summary judgment should be granted.

Defendant's also are entitled to an award of sanctions for having to defend this frivolous case that has no basis in law or fact and which clearly has been brought and continued by Plaintiff  in bad faith.  The evidence proving the anchor was dropped outside the cable area was provided to Plaintiff before Plaintiff filed suit.  The evidence of where the cable was laid had been in Plaintiff's possession since 2007 and Mr Ickes knew or should have known it was laid outside of the charted cable area in violation of his ACE permit. And Mr. Ickes' continuing to press this case, after the person who laid the cable testified it was laid outside of the cable area, demonstrates bad faith – as does his falsification of a letter to NOAA in an apparent attempt to

enhance Plaintiff's position in these proceedings.  In this case sanctions are appropriate, and they should be awarded for Defendants' full costs of defending this action since the complaint was filed.

## FACTS AND PROCEDURES

The facts relevant to Defendants' motion are set forth in the Defendants' Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Dispute, dated August 9, 2012 ("SOMF"), the Affidavit of Richard V. Singleton dated August 9, 2012 and Exhibits thereto ("Singleton Aff."), and the Declaration of Volodymyr Khrypunov Pursuant to 28 U.S.C. §1746, dated July 28, 2012 ("Khrypunov Decl.").

In October 2006, Plaintiff's principal, Brad Ickes, submitted a revised application to the U.S. Army Corps of Engineers ("ACE") and the New York State Department of Environmental Conservation ("NYDEC") for permission to construct an optic fiber cable buried in the sea bottom between Brooklyn and Staten Island.  (SOMF ¶¶ 1 – 2; Singleton Aff., Ex. A.)

Plaintiff's application represented that the cable would be laid within an existing charted cable area that crosses the Verrazano Narrows in an east/west direction under and to either side of the Verrazano Narrows Bridge, and that the cable would be buried to a depth of four feet in the navigation channel.  (SOMF ¶¶ 3 – 4; Singleton Aff., Ex. B.)  (The southernmost charted boundary of the cable area where it crosses the navigation channel is at latitude 40° 35.983' North.)  In December 2006, the ACE and the NYDEC approved Plaintiff's application based on the above and other representations contained in Plaintiff's application.  (SOMF ¶ 5; Singleton Aff., Ex. C.)

The cable was laid in early January 2007 by the M/V CABLE QUEEN.  Mark Sherry supervised the laying of the submarine cable and was present on the M/V CABLE QUEEN while

the cable was being laid.  (SOMF ¶¶ 6 - 7; Singleton Aff., Ex. D at 23-25.)  During the cable laying operation, the M/V CABLE QUEEN position was recorded by a laptop computer interfaced with an independent Differential Global Positioning System ("DGPS") unit.   A printout from this recording shows that the cable was not laid within the cable area or as represented in Plaintiff's permit application, but rather was laid almost entirely outside of the cable area in a direct line from its terminus on the Brooklyn side to its terminus on the Staten Island side.  Mr. Sherry testified that the M/V CABLE QUEEN's positions and track recorded by the DGPS unit was in accordance with his personal observations at the time and the M/V CABLE QUEEN's other navigational equipment..  (SOMF ¶¶ 9 – 12; Singleton Aff., Ex. D at 47-52 and Ex. E.)

The cable also was not buried to 4 feet in the navigation channel or deeper in shallow water as required by the ACE permit.  In fact it was not buried at all.  (SOMF ¶ 13; Singleton Aff., Ex. D at 49-50.)

Plaintiff never informed the ACE or the NYDEC that it had not laid the cable in accordance with the permit.  Nor did Plaintiff inform the National Oceanic and Atmospheric Agency ("NOAA"), the United States agency responsible for preparing and updating navigation charts, that the cable had been laid outside of charted cable area until well after the incident which is the basis of Plaintiff's Complaint and after Plaintiff commenced suit.  Thus, at the time of the events in this case, the location of Plaintiff's cable was not shown on the relevant navigation charts.  (SOMF ¶¶ 14 – 16; Singleton Aff., Ex. B and Ex. F.)

On April 11, 2010, the M/V AMBASSADOR (the "Vessel") departed from Brooklyn Naval Yard traveling south in the navigation channel intending to anchor south of the Verrazano

3

Bridge at Gravesend.    As the ship approached the Verrazano Narrows Bridge, the officers were navigating with United States Chart No. 12402.  (SOMF ¶¶ 17 – 18; Khrypunov Decl. ¶ 4.)

The Vessel was equipped with a simplified Vessel Data Recorder ("SVDR")(the maritime equivalent of a "black box" recorder), that records and stores data from the vessel's navigational equipment, including the ship's GPS.  It also records sounds from microphones installed at various locations on the vessel's bridge.  A playback of the SVDR data for any given time will show the ship's position (location), course, and speed at that time, as well as playback of the contemporaneous audio record of conversations occurring and sounds heard on the bridge. (SOMF ¶¶ 20 – 22; Khrypunov Decl. ¶¶ 5 - 7.)

After the Vessel passed under the Verrazano Bridge and after its bow was beyond the southernmost boundary and outside of the charted cable area, the vessel's anchor released. (SOMF ¶ 19; Khrypunov Decl. ¶ 8.)   The Vessel's SVDR recorded the unmistakable sound of the anchor chain rattling out at the moment when the anchor when released.  This began at precisely 10:30:12 (10:30 a.m. and 12 seconds).  The SVDR recorded the Vessel's position at this time as 40º 36.068 North (latitude) – 74º 02.698 West (longitude).  (SOMF ¶ 23; Khrypunov Decl. ¶¶ 9, 12 – 13 and Ex. 1.)

The position recorded by the SVDR is the position of the Vessel's GPS antenna located on top of the vessel's bridge.  The anchor, however, is located 195 yards forward of the GPS antenna near the ship's bow.  Thus, to determine the exact position of the anchor when it released it is necessary to add the 195 yard distance between the GPS antenna and the anchor to the anchor release position.  When this is done, it shows the anchor was released at least 33 yards outside of the southernmost boundary of the cable area.  (SOMF ¶¶ 24 – 25; Khrypunov Decl. ¶ 14.)

4

The anchor, however, could not have struck the seabottom at the position when it was released.  Before it can strike the bottom the anchor first must drop some 20 feet from where it is stowed in the hawse pipe to the water's surface and another 55 – 65 feet from the surface of the water to the seabottom.  The Vessel's Master estimated that it would take at least 5 seconds for the anchor to travel this distance to the sea floor.  But while the anchor was dropping to the sea floor, the Vessel continued to move southward.  Thus, the anchor would have contacted the sea bottom even farther away from the cable area than 33 yards, most likely at least 17 yards further away.  (SOMF ¶¶ 26 – 28; Khrypunov Decl. ¶¶ 14 – 15.)

After its cable was damaged, Plaintiff contracted for an underwater survey to be performed with a side scan sonar to try and locate the cable.  The recordings taken by the side scan sonar team show no anchor drag on or within the southernmost boundary of the charted cable area, but it does show an anomaly well outside of the cable area that appears to be where the anchor first hit bottom with a drag mark continuing southward.  The location of this anomaly is almost exactly where the SVDR data places the anchor drop and the continuing drag mark corresponds almost exactly with the ship's position and track as recorded by the SVDR.  (SOMF ¶¶ 29 – 30; Singleton Aff. ¶¶ 10 – 11 and Ex. H.)

After the cable was damaged, Plaintiff installed a replacement cable, much of which also was laid outside of the cable area.  The replacement cable has since been damaged and is no longer in service.  (SOMF ¶¶ 31 – 32; Singleton Aff. ¶ 13 and Ex. J.)

5

## THE SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well established and has been articulated many times by this Court. Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See, e.g., Weeks Marine, Inc. v. Am. S.S. Owners P&I Ass'n*, No. 10 Civ. 5191, 2012 U.S. Dist. LEXIS 46195, *6-7 (S.D.N.Y. Mar. 30, 2012). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Anderson*, 477 U.S. at 247-48); *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985). For the purposes of summary judgment, a fact is material if it "might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson*, 477 U.S. at 248). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). "[S]ome metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is insufficient to withstand summary judgment. Rather, Plaintiff must present "concrete evidence," not evidence that is "merely colorable, conclusory, or speculative." *Anderson*, 477 U.S. at 256.

6

## ARGUMENT

### POINT I

### THE VESSEL IS NOT LIABLE FOR DAMAGE RESULTING FROM DROPPING ITS ANCHOR OUTSIDE OF THE MARKED CABLE AREA

It is well settled that a vessel navigating inside of a marked channel is not liable if it strikes and damages an unknown submerged obstruction or other object that is not visible. *Mid-America Transportation Co. v. National Marine Service, Inc.*, 497 F.2d 776, 779 (8th Cir. 1974), *cert. denied*, 425 U.S. 937 (1976).   In such cases the position of the vessel and the character of the object at time of the allision is of "paramount importance" in determining the vessel's liability. *Id.* The "mere fact" that an allision with a submerged object occurs is insufficient to impose liability on the vessel.  *Peoples Natural Gas Co. v. Ashland Oil, Inc.*, 604 F. Supp. 1517, 1525 (W.D.Pa.1985).

The Ninth Circuit's decision in *The Georgie, 14 F.2d 98 (9th Cir. 1926)*, is directly on point.  In that case, the vessel damaged plaintiff's undersea cable when it dropped its anchor to assist in a docking maneuver.  The adjacent area contained signs warning about the location of a submerged cable, but in the area where the anchor dragged there was no sign to warn of the presence of the plaintiff's cable, nor was its location marked on any chart.  In finding the vessel not liable for damaging the plaintiff's cable, the court held: "the mere dropping of an anchor in public waters in the vicinity of an unknown and unmarked cable does not constitute . . . negligence." *Id.* at 99.

In so holding the Court rejected the very argument presented by Plaintiff here, that the ship was not permitted to drop her anchor outside of charted anchorages, reasoning that the "primary object" of regulations establishing such anchorage grounds is to "insure safe navigation

7

on the surface, **not to protect submarine cables or other structures beneath the water**." *Id.* at 100 (emphasis supplied).

Other courts have reached similar conclusions.  In *Essex County Electric Co. v. The Godafoss*, 129 F. Supp. 657, 661 (D. Mass. 1955), the owner of unmarked cable claimed against a vessel whose anchor had dragged into and damaged the cable. The court held that the cable owner, and not the vessel owner, was fully responsible for the damage for failing to properly mark its cable. Likewise, in *Delta Transload, Inc. v. Motor Vessel, "Navios Commander"*, 818 F.2d 445 (5th Cir. La. 1987), a ship dragged its anchor and damaged an unmarked and uncharted submerged buoy.  In holding the ship was not liable, the Fifth Circuit reasoned that the presumption of negligence that ordinarily applies when a vessel strikes a stationary object does not apply to allisions with "sunken and hidden objects." *Id.* at 450.

To be sure, a vessel will be liable if it drops its anchor in a charted cable area or on some other charted or marked property. *Canadian P. R. Co. v. United States*, 272 F.2d 913, 914 (9th Cir. 1959).  A charted obstruction is the equivalent of a stationary visible object.  *Algoma Cent. Corp. v. Michigan Limestone Operations*, No. 94-1917, 1996 U.S. App. LEXIS 3454, 16-17 (6th Cir. Jan. 22, 1996).  But that simply is not the case presented here.

The uncontroverted evidence establishes both that Plaintiff's cable was laid far outside of the charted cable area and that the Vessel dropped its anchor south of the cable area's southernmost charted boundary. It is uncontroverted that during the operation to lay Plaintiff's cable in January 2007, the position of the cable-laying vessel was recorded by a lap top computer interfaced with an independent Differential Global Positioning System ("DGPS") unit. (Singleton Aff., Ex. D at 14, 51.)  It also is uncontroverted that a printout from this recording (Singleton Aff., Ex. E) shows that the cable was not laid within the cable area, but rather was laid

8

almost entirely outside of the cable area in a direct line from Brooklyn to Staten Island.  As shown in Exhibit E, where the cable crosses the center of the navigation channel, it was laid more than 200 yards south of the southern boundary of the cable area.  Mr. Sherry, who was on board the cable-laying vessel while the cable was being installed and monitoring the position recording equipment testified as to the accuracy of this "as-laid" location of the cable. (Singleton Aff., Ex. D at 48.)

The evidence also is uncontested that the Vessel dropped its anchor outside of the charted cable area.  As the Vessel proceeded south in the navigation channel south of the Verrazano Bridge, its position, course and speed were recorded by its SVDR, along with a contemporaneous audio record of conversations occurring and sounds heard on the bridge. (Khrypunov Decl. ¶¶ 6 – 7.)  After the Vessel's bow was beyond and outside of the southernmost boundary of the charted cable area, the Vessel's SVDR recorded the unmistakable sound of the anchor chain rattling out at the moment when the anchor when released.  This began at precisely 10:30:12 a.m.  The Vessel's latitude at this time was recorded by the SVDR as 40º 36.068 North, or about 162 yards north of the cable area's southern boundary.  (*Id*. at ¶¶ 12 – 13 and Ex. 1.) But as the Vessel's Master explained in his Declaration, the position recorded by the SVDR is the position of the Vessel's GPS antenna located on top of the vessel's bridge.  The anchor is located 195 yards forward of the GPS antenna near the ship's bow.  When the 195 yard distance between the GPS antenna and the anchor is added to the anchor release position, it is clear that the anchor was released at least 33 yards outside of the southernmost boundary of the cable area. (*Id*. at ¶ 14.)

In addition, Master estimated that it would take at least 5 seconds for the anchor to drop some 20 feet from where it is stowed in the hawse pipe to the water's surface and another 55 –

65 feet from the surface of the water to the seabottom.  But while the anchor was dropping to the sea bottom, the Vessel continued to move southward at least 17 more yards.  Thus, the anchor would have contacted the sea bottom at least 50 yards south of the southern cable are boundary. (*Id.* at ¶¶ 15 – 16.)

An underwater side scan sonar survey performed after the cable was damaged shows no anchor drag on or within the southernmost boundary of the charted cable area, but it does show an anomaly well south of the cable area that appears to be where the anchor first hit bottom with a drag mark continuing southward.  The location of this anomaly is almost exactly where the SVDR data places the anchor drop and the continuing drag mark corresponds almost exactly with the ship's position and track as recorded by the SVDR.  (Singleton Aff., Ex. H.)

Since the cable was laid outside of the cable area and was not marked on any navigation chart, the Vessel had no way of knowing it was there.  The Vessel therefore was entitled to drop the anchor where it did and is not responsible if the anchor damaged the cable.

<div align="center">

**POINT II**

**PLAINTIFF BEARS THE ENTIRE RESPONSIBILITY FOR
DAMAGES TO THE CABLE FOR ITS FAILURE TO
COMPLY WITH THE TERMS OF ITS PERMIT**

</div>

The authority for the ACE to issue permits for the installation of structures in navigable waters, including submerged cables, is governed by the Rivers and Harbors Act, 33 U.S.C. § 401, 403.  *See, e.g., Am. Telephone & Telegraph Co. v. Steuart Transp. Co.*, No. HM-74-698, 1978 A.M.C. 1680, 1681 (D. Md. Sep. 2, 1977).  The failure to comply with the terms of a ACE permit is a violation of the River and Harbors Act.  *See, e.g., American Zinc Co. v. Foster*, 313 F. Supp. 671, 680 – 81 (S.D. Miss. 1970), *modified on other grounds*, 441 F.2d 1100 (5th Cir.), *cert. denied*, 404 U.S. 855 (1971).  This statutory violation gives rise to a presumption of negligence *per se* and results in the creation of an unlawful obstruction to navigable waters.

<div align="center">10</div>

*Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1382-1383 (11th Cir. 1982); *Atlantic Pipeline Co. v. Dredge Philadelphia*, 247 F. Supp. 857, 862 (E.D. Pa. 1965), *affd.*, 366 F.2d 780 (3rd Cir. 1966).

In *Orange Beach, supra*, the court found that the indisputable evidence showed that the pipeline owner's failure to maintain the pipeline in accordance with the terms of its ACE permit contributed to the damage.  Thus, the court remanded the case to the district court for apportionment of damages against the pipeline owner.  In *Peoples Natural Gas Co.,* 604 F. Supp. at 1528, the court found that the failure to maintain a pipeline below the riverbed, as required by the terms of the plaintiff's ACE permit, was the sole cause of the allusion.  Plaintiff thus was required to bear the entire responsibility for damages.  In *Delta Transload*, 818 F.2d at 450, the court found that by placing a buoy in a location where it was in violation of a ACE permit and where it was more likely to be fouled, the party responsible for its placement could have been at fault for causing the accident.

The present case is no different.  Plaintiff applied to the ACE for permission to install its fiber optic submarine cable between Brooklyn and Staten Island, New York.  (Singleton Aff., Ex. A.)  Plaintiff's application represented that "[a]pproximately 3,500 feet of cable would be located in an existing cable crossing area approximately 500-feet south of the Verrazano Narrows Bridge."  (Singleton Aff., Ex. C.)  Plaintiff's application also represented that "[t]he majority (deeper depths) of the channel crossing would be accomplished by burying the cable, via sled, approximately 4-feet below the seafloor."  (*Id.*)

Based on these and other representations, on December 8, 2006, the ACE approved Plaintiff's application and granted it permission to perform the work.  (*Id.*)  The ACE's approval cautioned, however, that "[t]his determination covers only the work described in the submitted

11

material.   Any major changes may require additional authorizations from the New York

District."  (*Id*. at 3.)  The permit also required Plaintiff to certify to the USACE that the cable

was laid in accordance with the terms and conditions of the permit.  (*Id*. at 4.)

As discussed under Point I above, the cable was not laid within the cable area or as

represented in Plaintiff's permit application, but rather was laid almost entirely outside of the

cable area in a direct line from its terminus on the Brooklyn side to its terminus on the Staten

Island side.  Mr. Sherry, hired by Plaintiff to supervise laying the cable (Singleton Aff., Ex. D at

24 – 25), testified:

> We had to go as direct as possible because we were concerned
> about the length of the available cable . . . There was never a
> question in discussion about going through the Narrows.  With the
> current and the amount of cable that we pulled on either side, I had
> no choice.

(*Id.* at 48 – 51.)

Mr. Sherry also testified that no sled was used in the cable laying process and, as a result,

the cable was not buried at all.  (*Id.* at 49.)

Plaintiff never informed the ACE that it had not laid the cable in accordance with the

permit.  And not until well after Plaintiff commenced suit did it notify the United States agency

responsible for preparing and updating navigation charts that the cable had been laid outside of

charted cable area.  Thus, at the time of the events in this case, the location of Plaintiff's cable

was not shown on the relevant navigation charts.  (Singleton Aff. ¶¶ 8 – 9, and Exs. F and G.)

In short, Plaintiff intentionally laid its cable well outside of the cable area in violation of

the permit for its construction. This is a violation of law and is negligence *per se*, to which

Plaintiff has no defense.  The responsibility for the loss therefore rests completely on Plaintiff –

as it should.  Plaintiff chose to lay its cable outside on the cable area in violation of its permit and

12

then compounded its wrongdoing by failing to notify ACE of the cable's true location or timely requesting the United States charting agency, NOAA, to mark cable's location on the relevant navigation charts.  Having chosen this course, Plaintiff must now bear the consequences.

<div align="center">

**POINT III**

**DEFENDANTS ARE ENTITLED TO AN AWARD OF SANCTIONS FOR PLAINTIFF'S BRINGING AND MAINTAINING A FRIVOLOUS SUIT IN BAD FAITH**

</div>

The Court has the power to sanction Plaintiff and its counsel under either Rule 11(b) of the Federal Rules of Civil Procedure[1] or 28 U.S.C. § 1927.[2]  The Court may award such sanctions "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011) (*quoting Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009)) (internal quotations omitted).  In addition, sanctions may be imposed when there is a finding of "conduct constituting or akin to bad faith." *60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities, Inc.)*, 218 F.3d 109, 115 (2d Cir. 2000) (*quoting Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997)) (internal quotations

---

[1] Fed. R. Civ. P. 11(b) provides in relevant part that "[b]y presenting to the court a pleading, written motion, or other paper," an attorney . . . certifies "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; . . .

[2] 28 U.S.C. § 1927 provides in relevant part that "[a]ny attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

<div align="center">13</div>

omitted).  *See also State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 180 (2d Cir. 2004), *cert. denied*, 543 U.S. 1177 (2005) (activities sanctionable if so completely without merit that it must be concluded that they were undertaken for some improper purpose such as delay).  The Court also retains inherent power to sanction attorneys and award fees.  *See, e.g., Excess Ins. Co. v. Odyssey Am. Reinsurance Corp.*, No. 05 Civ. 10884, 2007 U.S. Dist. LEXIS 88441, 6-7 (S.D.N.Y. Nov. 28, 2007)(*citing Chambers v. NASCO*, 501 U.S. 32 (1991)).

Plaintiff's commencement of this suit and its refusal to discontinue it in the face of overwhelming evidence that the Vessel's anchor drop and Plaintiff's own cable were well outside of the charted cable area mandates an award of sanctions against Plaintiff and its counsel. Prior to bringing suit, the parties exchanged considerable information concerning the location where the Vessel dropped its anchor.  Shortly after the incident, the Vessel's SVDR data was provided in native format to Plaintiff's counsel, and the parties exchanged documents and information.  The parties also attended a meeting with the side scan sonar experts for each side and shared the information the experts had gathered.  Thus, Plaintiff knew well before bringing suit that the Vessel's anchor contacted the sea bottom outside of the cable area.

Plaintiff likewise knew or should have known the cable was laid well outside of the cable area in violation of its permits long before it commenced this suit.  Plaintiff laid the cable at issue.  Plaintiff owned the M/V Cable Queen, the vessel that laid the cable, presumably employed the vessel's crew, and hired Mr. Sherry.  At a pre-trial conference on November 16, 2011, Plaintiff acknowledged that it was unable to produce any evidence to contradict Defendants' overwhelming evidence proving that Plaintiff's cable was outside of the cable area when it was damaged (and therefore Defendant could not be liable for the damage).  Plaintiff

14

also has been unable to explain why it does not have the logs or did not preserve the GPS records from the M/V CABLE QUEEN – even though it still owns the vessel today.

It is inconceivable that Plaintiff would not have understood that the cable was laid outside of the cable field  But in any event, Mr. Sherry's testimony put any doubt about this to rest. (Singleton Aff. Ex. D at 60, 66-67.)  Yet Plaintiff continued to maintain and apparently still maintains – that the cable was laid within the cable field.  And Plaintiff has continued to pursue this case even after Mr. Sherry's deposition and the exhibits marked thereon, which left no doubt as to the cable's location.

Plaintiff's bad faith and dishonesty is best demonstrated by the falsification of the date on the letter Plaintiff sent to NOAA.  (*See* Singleton Aff. Ex. F.)  The letter is dated January 25, 2008, and Plaintiff represented in answer to interrogatories and then to the Court that the letter was sent in January 2008.  But documents produced by NOAA in response to a subpoena served by Defendants prove that Mr. Ickes' letter was back dated and actually was not sent to NOAA until late November 2011. This unquestionably is conduct that should be sanctioned.

_____

The Court has on several occasions requested that Plaintiff consider voluntarily discontinuing this case in view of Plaintiff's total lack of evidence to support its position and Defendants' overwhelming evidence that it has no liability.  Plaintiff has stubbornly refused to do so, electing to continue with a case that it has admitted it has no hard evidence to pursue and forcing Defendants to go to the additional expense of moving for summary judgment. By brining an action that Plaintiff knew or should have known was frivolous, and by continuing with the action in the force of irrefutable evidence that it has no case, Plaintiff has forced Defendant to incur substantial costs and fees of defense.

15

Accordingly, Defendants request the Court award of sanctions against Plaintiff for its bad faith refusal to discontinue this action, which total $72,000. If the Court agrees, Defendants will provide appropriate supporting documentation to substantiate the quantum claimed.

## CONCLUSION

Based on the foregoing, there can be no genuine dispute that the Vessel dropped its anchor outside of the charted cable area. It is equally undisputed that Plaintiffs' cable was laid well outside of the cable area in violation of its permit and that the damage occurred outside of the cable area. Accordingly, Defendants can have no liability for the damage to Plaintiffs cable and respectfully request that the Court enter an order granting summary judgment dismissing Plaintiff's Complaint with prejudice and for other and further relief as the Court deems just and proper.

Dated:        August 9, 2012

<div style="margin-left:40%">

BLANK ROME LLP
Attorneys for Defendants,
M/V AMBASSADOR and MARBULK
CANADA INC.

**By: /s/Richard V. Singleton**
        Richard V. Singleton
        Alan M. Weigel
        Blank Rome LLP
        405 Lexington Avenue
        New York, NY  10174
        (212) 885-5166
        (917) 332-3734
        rsingleton@blankrome.com

</div>

To:    Michael E. Stern, Esq.
       Rubin, Fiorella & Friedman LLP
       292 Madison Avenue
       New York, NY 10017

       *Attorneys for Plaintiff*

16