BLANK ROME LLP
Attorneys for Defendants
Richard V. Singleton II (RS-9489)
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0208
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPTICAL COMMUNICATIONS GROUP, INC., <br><br> Plaintiff, <br><br> -against- <br><br> M/V AMBASSADOR, its engines, boilers, furniture, tackle, apparel, etc., *in rem* and MARBULK CANADA INC., *in personam*, <br><br> Defendants. | 11 Civ. 4439 (NRB) <br><br> **DECLARATION OF VOLODYMYR KHRYPUNOV PURSUANT TO 28 U.S.C. §1746** |

I, Volodymyr Khrypunov, declare:

1.  I am a ship's captain by profession. I hold a master's license for unlimited size vessels in all geographic areas. I have worked on seagoing vessels since 1975, and have served as a master of ocean-going vessels since 1998. My native language is Ukrainian, but I speak and read English with competence. English is the international language of mariners.

2.  I have twice served as the master of the M/V AMBASSADOR. The first time was from January 23, 2010 to May 10, 2010. The second time was from December 10, 2010 to April 20, 2011.

3.  The M/V AMBASSADOR is a self-discharging bulk carrier owned by Marbulk Canada, Inc. She is 222.4 meters (729.5 feet) in length overall, 23.17 meters (75.99 feet) in breadth and has a deadweight of 37,263 tons.

4. On April 11, 2010, the M/V AMBASSADOR departed from the GMD Docks in Brooklyn (north of the Manhattan Bridge) traveling south in the navigation channel intending to anchor south of the Verrazano Narows Bridge at Gravesend.  I was on the bridge with the sea pilot, my chief officer, and other members of my crew.  As we approached the Verrazano Narrows Bridge, the ship was navigating with United States' Chart No.12402.

5. The M/V AMBASSADOR was equipped with, among other navigational equipment, two radars, an Electronic Chart Display (ECDIS), 2 GPS units, depth sounder, and a speed logger.   The M/V AMBASSADOR also was equipped with Simplified Vessel Data Radar ("SVDR").

6. The SVDR essentially is the maritime equivalent of a "black box." It is a device that records and preserves information from the ship's navigational equipment, including the ship's position (location), course, and speed. It also records sounds from microphones installed at various locations on the vessel's bridge.

7. A playback of the SVDR data for any given time thus will show the ship's position, course and speed for that time.  It will also provide a contemporaneous audio recording of conversations occurring on the bridge and other sounds audible from the bridge.

8. After the ship passed under the Verrazano Narrows Bridge, and when her bow was south of and outside the charted cable field, the vessel's port anchor deployed.

9. I knew this the moment it happened.  When an anchor is released, the anchor chain rumbling through the hawse pipe in a vessel's hull makes an immediate and unmistakable sound which can be heard on the bridge.

10. When the anchor was winched in, the chief officer who had gone to the bow to investigate reported that be observed what appeared to be on old  wire rope or towing

hawser hanging from one of the anchor's flukes. We thought this was part of some discarded debris lying on the sea floor. I learned later that allegations were made that the anchor had snagged an operational optic fiber cable.

11. After the incident I directed the Third Officer to download the SVDR data. I personally supervised him doing so, and I reviewed the retrieved data.

12. The sound of the anchor chain beginning to run out can clearly be heard on the SVDR recording, and it began at precisely 10:30:12 am. The SVDR recorded the vessel's position at this time as being 40°36.068N - 74°02.698W. The vessel's speed was 6.1 knots. A true and correct copy of the SDVR screen shot for 10:30:12 am is attached hereto as Exhibit 1.

13. The time indicated on the SDVR screen shot of 2:30:12 pm is "UTC" (Coordinated Universal Time) time. The local time in New York was 4 hours behind UTC. So 2:30:12 pm UTC actually was 10:30:12 am in New York.

14. The "position" recorded on the SVDR actually is the location of the vessel's GPS antenna which is mounted on top of the vessel's bridge. The anchor is located near the bow of the ship some 195 yards forward of the GPS antenna. To determine the exact position where the anchor released, it is necessary to add the distance from the GPS antenna to the anchor. When this is done, it shows the anchor was released at least 33 yards outside the southernmost boundary of the cable field.

15. Although the anchor was released in that position, it could not have struck bottom there. Once released, the anchor must drop some 20 feet from where it is stowed in the hawse pipe in the hull to the water surface, and then another 50-55 feet from the surface of the water to the seabottom, which is the water depth in the location under consideration.

3

16. Some time would pass between the time the anchor release was first heard and the time the anchor contacted the seabottom. I do not know exactly what this time would be but estimate based on my experience it would take at least 5 seconds. Since the ship continued to move forward as this was happening, the anchor would have been even further away from the cable field when it first contacted the bottom. Given the ship's speed over the ground (SOG) of 6.1 knots, as reflected on the SVDR screen, the vessel would have travelled an additional 17 yards south and away from the cable field boundary in these 5 seconds.

17. After the incident, the chief officer placed a mark on the navigation chart at position 40-35.8N and 74.02.6W, representing the position where he believed the anchor released. This position is much farther south (farther away from the cable field) than indicated by the SVDR data.

18. I prepared a written statement at the request of the United States Coast Guard, which I submitted before reviewing the SVDR data. A copy is attached as Exhibit 2. In this statement I repeated the chief officer's anchor drop time and position. I had not yet reviewed the SDVR data when I submitted my statement. I consider the SVDR position to be more accurate. In any event, all vessel data indicates the anchor was released well south of the charted southernmost boundary of the cable field.

19. I gave a copy of a disc with the downloaded SVDR data to Mr. Richard Singleton of Blank Rome LLP when he visited the vessel on April 28, 2010.

> I SWEAR UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: July 28th, 2012

_____
VOLODYMYR KHRYPUNOV

134508.00601/7149147v.1








## U.S. COAST GUARD
## WITNESS STATEMENT FORM
(Please Print Clearly)

Witness Name: Khrypunov Volodymyr       Employer Name: Khrypunov Volodymyr
Street Address: 40/55 G. Petrova str     Employer Address: 40/55 G. Petrova str
City/State/Zip: Odessa, Ukraine          City/State/Zip: Odessa, Ukraine
Phone No: +38048 761-15-52               Phone No: +38048 761-15-52
Position: Master                         License/Doc. #: 09 - 51050

I, the undersigned, make the following statement voluntarily, without threat, duress or promise of reward:

On April 11, 2010 the vessel proceeded from Brooklyn # 3 Wet Berth to Gravesend Bay Anchorage with Pilot Capt. M. Schnepp and two tugs assistant. At 10:33 LT during preparation of Port Anchor to let go the Port Anchor incidentally let go and 1.5 shackles of cable paid away in the water. Weather conditions: Wind/Sea S4/2 BF
10:27 Passed under Verrazano Bridge. I gave the order to commence preparation of Port Anchor to Let go, lowering it up to 1 meter above the water. Proceeded with DSAH. Speed around 5.5 KN. Max draft : 7.40m (24'03").
10:33 Port Anchor incidentally let go and around 1.5 shackles of cable paid away in the water (2 shackles on Deck) in position Lat 40-35.8N Long 074-02.6W . Depth 50 feet Ground: Mud & Shells, Engine STOP & Half Astern.
10:37 Engine STOP.
10:45 Commenced to heave up anchor.
10:55 Anchor awash, reported spoiled with old wire rope.
10:58 U.S.C.G. was advised by Pilot regarding incident. DPA Capt. Alex Bublik and Fleet Superintendent Mr. Tim Twomey were advised by Cell phone.
I sent Chief Officer on Forecastle to investigate the event. He reported / confirmed that there was a wire on Anchor Fluke and he requested for permission to lowering anchor in the water in order to release the wire.
1121 Port Anchor cleared, wire rope slid & fell down in the water after several attempts by lowering Anchor in the water in position Lat 40-35.25N Long 074-02.0W
Proceeded to anchorage.
1136 Let go Starboard Anchor. Anchored at Gravesend Bay Anchorage for bunker replenishment.

Just before disembarkation the Pilot again contacted to U.S.C.G. and report position where the Port Anchor was incidentally dropped.
11.55 Pilot left.

I have read my statement as documented above (and, if applicable, on continuation pages), and to the best of my knowledge and belief, it is true and correct.

_____          16.04.2010
SIGNATURE                                DATE

                                         28.07.2012