BLANK ROME LLP
Attorneys for Defendants
Richard V. Singleton II
Alan M. Weigel
The Chrysler Building
405 Lexington Avenue
New York, NY  10174-0208
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPTICAL COMMUNICATIONS GROUP, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>M/V AMBASSADOR, its engines, boilers, furniture, tackle, apparel, etc., *in rem* and MARBULK CANADA INC., *in personam*,<br><br>Defendants. | 11 Civ. 4439 (NRB)<br><br>**RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE** |

Defendants submit that there is no genuine dispute as to the following material facts:

1. In October 2006 Plaintiff submitted a revised application to the Army Corps of Engineers ("ACE") and the New York State Department of Environmental Conservation ("NYDEC") for permission to construct an optic fiber cable buried in the seabottom between Brooklyn and Staten Island.  (Singleton Aff. ¶ 3 and Exh. A.)

2. The application was signed and submitted by Brad Ickes, the principal of Plaintiff. (*Id.*)

3. Plaintiff's application represented that the cable would be laid within an existing charted cable field and that the cable would be buried to a depth of four feet in the navigation channel.  (Singleton Aff. Exh. A, p. 2, showing Plaintiff's representations of the

proposed route of the cable in the charted cable field and bearing notation "BURY CABLE 4 FEET +/-.")

4. The existing charted cable field is an area about one-half mile wide that crosses the Verrazano Narrows in an east/west direction under and to either side of the Verrazano Narrows Bridge. Its southernmost boundary is latitude 40° 35.983N where it crosses the navigation channel. (Singleton Aff., Exh. B.)

5. The ACE and the New York Department of Environmental Conservation ("NYDEC") approved Plaintiff's application on or about December 8, 2006 based on the above and other representations contained in Plaintiff's application, confirming that the cable's construction was authorized under Nationwide General Permit 12. (Singleton Aff. ¶ 5 and Exh. C.)

6. The cable was laid by the M/V CABLE QUEEN in early January 2007. (Singleton Aff. ¶ 5 and Exh. D at 23.)

7. Mark Sherry supervised the laying of the submarine cable and was present on the CABLE QUEEN during the time the cable was laid. (Singleton Aff., Exh. D at 24 – 25.)

8. Mr. Ickes was not present when the cable was laid. (Singleton Aff., Exh. D at 52.)

9. The cable was not laid within the cable area or as represented in Plaintiff's permit application, but rather was laid almost entirely outside of the cable area in a direct line from its terminus on the Brooklyn side to its terminus on the Staten Island side. (Singleton Aff., Exh. D at 51 – 52.)

10. The track of the M/V CABLE QUEEN was recorded by a laptop computer interfaced with an independent Differential Global Positioning System ("DGPS") unit that

recorded the CABLE QUEENS's positions during the cable laying operation. (Singleton Aff., Exh. D at 14, 47 – 48, 83.)

11. A printout from computer recording shows that the cable was laid outside of the cable area. (Singleton Aff., Exh. D at 50 - 51, and Exh. E.)

12. Mr. Sherry testified that he was monitoring the CABLE QUEEN's own GPS equipment and confirmed that the recorded track on Exhibit 5 to his deposition (Singleton Aff., Exh. E) was in accordance with his personal observations at the time. (Singleton Aff., Exh. D at 48.)

13. The cable was not buried to 4 feet in the navigation channel or deeper in shallow water as required by the ACE permit. In fact <u>it was not buried at all.</u> (Singleton Aff., Exh. D at 49 – 50.)

14. Plaintiff <u>never</u> informed the ACE or the NYDEC that it had not laid the cable in accordance with the permit. (Plaintiff's counsel's admission in open court.)

15. Plaintiff claims, and represented in its answer to interrogatories and in open court, that in January 2008 it sent notification to the United States agency responsible for preparing and updating navigation charts ("NOAA") that it had laid the cable outside of charted cable area. (Singleton Aff. ¶ 9 and Exh. G.)

16. Documents produced by NOAA pursuant to a subpoena served by Defendants, however, prove that Plaintiff did not inform NOAA that plaintiff had laid the cable outside of charted cable area until December 2011 – well after the incident which is the basis of Plaintiff's Complaint and after Plaintiff commenced this suit. (Singleton Aff. ¶8 and Exh. F.)

17. At the time of the events in this case the location of Plaintiff's cable was not shown on the relevant navigation charts. (Singleton Aff., Exh. B.)

134508.00601/7149288v.1

18. On April 11, 2010, the M/V AMBASSADOR departed from Brooklyn Naval Yard traveling south in the navigation channel intending to anchor south of the Verrazano Bridge at Gravesend. (Khrypunov Decl., ¶4.)

19. As the ship approached the Verrazano Narrows Bridge, the officers were navigating with United States Chart No. 12402. (Khrypunov Decl., ¶4.)

20. After the ship passed under the Verrazano Bridge and after its bow was beyond the southernmost boundary and outside of the charted cable field, the vessel's anchor released. (Khrypunov Decl., ¶8.)

21. The M/V AMBASSADOR was equipped with a Vessel Data Recorder or "SVDR," which is the maritime equivalent of a "black box" for ships, that records and stores data from the vessel's navigational equipment, including the ship's GPS. It also records sounds from microphones installed at various locations on the vessel's bridge. (Khrypunov Decl., ¶¶5-6.)

22. A playback of the SVDR data for any given time will show the ship's position (location), course, and speed at that time. (Khrypunov Decl., ¶7.)

23. The SVDR playback also provides a contemporaneous audio record of conversations occurring and sounds heard on the bridge.

24. The AMBASSADOR's SVDR recorded the unmistakable sound of the anchor chain rattling out at the moment when the anchor when released. (Khrypunov Decl., ¶9). This began at precisely 10:30:12 (10:30 a.m. and 12 seconds). The SVDR recorded the vessel's position at this time as 40º 36.068 North (latitude) – 74º 02.698 West (longitude). (Khrypunov Decl., ¶¶12-13 and Exh. 1.)

25. The "position" recorded by the SVDR is the position of the vessel's GPS antenna located on top of the vessel's bridge. The anchor is located 195 yards forward of the GPS antenna near the ship's bow. (Khrypunov Decl., ¶14.)

26. The exact position of the anchor when it is released is determined by adding this 195 yard distance from the GPS antenna to the anchor to the anchor release position. When this is done, it shows the anchor was released some 33 yards outside of the southernmost boundary of the cable field. (Khrypunov Decl., ¶14.)

27. The anchor, however, could not have struck the seabottom at the position when it was released. Before it can strike the bottom the anchor first must drop some 20 feet from where it is stowed in the hawse pipe to the water's surface and another 55 – 65 feet from the surface of the water to the seabottom. It would take at least 5 seconds for the anchor to travel this distance to the sea floor. (Khrypunov Decl., ¶15.)

28. Since the ship contained to move southward as the anchor was dropping, the anchor would have contacted the bottom even farther away from the cable field than 33 yards, most likely at least 17 yards further away. (Khrypunov Decl., ¶14.)

29. Subsequent to the incident, the chief officer placed a mark on the vessel's navigation chart where he believed the anchor was dropped. This is well south of and further away from the charted cable field than the actual drop position indicated on the SVDR data. (Khrypunov Decl., ¶ 17.)

30. Plaintiff contracted for an underwater survey to be performed by side scan sonar shortly after the incident to try and locate the cable. The "pictures" of the sea bottom taken by the side scan sonar shows no anchor drag within the charted cable field or even on its southernmost boundary. But the side scan sonar pictures do show an anomaly well outside and

south of the cable field that appears to be where the anchor first hit bottom with a drag mark continuing southward. (Singleton Aff. ¶10 and Exh. H.)

31. The location of this anomaly is almost exactly where the SVDR data places the anchor drop and the continuing drag mark corresponds almost exactly with the ship's position and track as recorded by the SVDR. (Singleton Aff. ¶ 11 and Exh. I.)

32. After the cable was damaged, Plaintiff installed a replacement cable, much of which was laid outside of the cable field. (Singleton Aff. ¶ 12 and Exh. J, which is a drawing prepared by Plaintiff's contractors showing the placement of the replacement cable.) According to a legend provided by Plaintiff, the dotted dark caterpillar-like line represents the replacement cable; the solid red line with diamonds shows the position of the original cable as found after the damage. (Singleton Aff. ¶ 12.)

33. The replacement cable has since been damaged and is no longer in service. (Plaintiff's representation in open court.) (Singleton Aff. ¶ 13.)

Dated: August 9, 2012

        BLANK ROME LLP
        Attorneys for Defendants,
        M/V AMBASSADOR and MARBULK
        CANADA INC.


By: **/s/Richard V. Singleton**
        Richard V. Singleton
        Blank Rome LLP
        405 Lexington Avenue
        New York, NY  10174
        (212) 885-5166
        (917) 332-3734
        rsingleton@blankrome.com

To:   Michael E. Stern, Esq.
      Rubin, Fiorella & Friedman LLP
      292 Madison Avenue
      New York, NY 10017

      *Attorneys for Plaintiff*

134508.00601/7149288v.1